**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINA
Alexandria Division**

| | |
|---|---|
| VULY PTY LTD<br><br>   Plaintiff,<br><br>v.<br><br>WEI YANG,<br><br>   Defendant. | Case No. 1:20-cv-988<br><br>COMPLAINT FOR MISAPPROPRIATION, TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY, AND DECLARATORY JUDGEMENT OF PATENT OWNERSHIP |

Plaintiff Vuly Pty Ltd ("Vuly" or "Plaintiff"), by and through undersigned counsel of record, hereby complains against Defendant Wei Yang ("Yang" or "Defendant") as follows:

## NATURE OF ACTION

1. This is a complaint for misappropriation of intellectual property, tortious interference with business expectancy, and for declaratory judgement declaring Vuly the sole owner of U.S. Patent No. 9,399,152 (the '152 patent). Defendant Yang has unfairly misappropriated an invention belonging to Vuly and has filed a patent application, which has subsequently issued into the '152 patent for that invention, unlawfully listing Yang as the applicant. The patent issued to Yang rightfully belongs to Vuly and all benefit derived from it rightfully belongs to Vuly.

## THE PARTIES

2. Vuly is an Australian proprietary limited company having its principal place of business in Wakerly, Queensland.

3. Upon information and belief, Defendant is an individual located in Brisbane, Australia.

## JURISDICTION AND VENUE

4. This Court has personal jurisdiction over the defendant pursuant to 35 U.S.C. § 293.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1338(a) (arising under the patent laws). The Court also has supplemental jurisdiction over the state-law causes of action asserted herein under 28 U.S.C. § 1367(a).

6. Venue is proper within the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

7. Joe Andon is the chief executive officer (CEO) of Vuly and a number of related entities that comprise the Vuly group of companies, including Vuly Property Pty Ltd. Vuly is engaged in the business of designing and manufacturing trampolines and associated products.

8. Yang commenced employment with Vuly in March 2011 as a mechanical engineer. Although lacking prior experience in trampoline design, Yang had acquired extensive mechanical design experience across several other fields.

9. Yang was promoted to engineering manager of Vuly in 2012. Yang was involved in the product design, research, development, and testing of improvements to all new product conceived and developed by Vuly, as well as most improvements or modifications to the existing product range. Yang's involvement was primarily in relation to the mechanical engineering aspects of those matters. Yang was involved in most of the research activities of Vuly, including concept development and prototype design, development, construction, and testing. Yang was also closely involved with a number of third parties who provide assistance to Vuly with the aspects of Vuly's research and development, including design consultants.

10. Yang's employment with Vuly was governed by a comprehensive series of agreements. In accordance with these agreements, Yang was obliged to assign any intellectual property developed by him to Vuly during the Course of his employment.

11. Vuly's CEO informed Yang of Vuly's design objectives in a number of discussions held between them when Yang started employment with Vuly. Under the initial direction of Mr. Andon, Yang focused his activities on developing a trampoline which was later designated as the Vuly "thunder" trampoline (the "Thunder Trampoline"). Yang's primary aim was to design a leaf spring system for connecting the bounce mat to the base of the trampoline. The Thunder trampoline differs in a number of respects from the trampolines discussed herein, most notably because the Thunder Trampoline utilizes safety poles that are vertical and not cross-joined.

12. In April 2011, Yang and Vuly began working in conjunction with D3 Design, a design company engaged by Vuly. A prototype of a trampoline that embodied a leaf spring system was built by Yang in June 2011. Although showing promising results under performance testing, Vuly and Yang considered that further refinement of the prototype was needed. Yang proceeded to explore other design options with the assistance of D3 Design.

13. During the final months of 2011, Vuly attempted to create a new design for a trampoline in which the safety net and poles presented a more integrated look than the trampolines on the market at the time. The early designs had safety poles which curved outward from the center of the trampoline in an upward direction from its base. However, there was a limit to the amount of curvature that could be achieved in these designs.

14. When contemplating the curvature problem, Vuly discovered that the safety poles could be Y-shaped with the tops of the "Y" extending around the trampoline (the "Y Design"). Vuly considered that the Y design would be suitable for a range of new and existing trampolines including the Thunder Trampoline, and could be used for the poles supporting the safety net which would also make the whole design of the trampoline and safety net appear to be more integrated, rather than the safety net looking like an afterthought.

15. Vuly discussed the Y Design with D3 Design and during these discussions it was suggested that:

    a. The tops of the "Y's" could be extended and could cross over one another, being joined to one another for structural support at the end of the branches of each "Y"; and

    b. Another option was to remove the legs of the "Y's" but still have the safety poles cross over once or twice and be joined at the crossovers to provide additional strength and/or stiffness (the "cross-over design").

16. These concepts were duly considered by D3 Design, and on November 18, 2011 David Francis of D3 Design sent an email to Vuly's CEO attaching some design proposals for enhancing the appearance of a prototype supplied by Vuly (the Francis email). The attachments included preliminary sketches of the Y design and the cross-over design. After explaining the design proposals at some length, Mr. Francis ended by saying that "If you like this thinking and the direction it is taking the trampoline, then we can begin chatting to [Yang] about doing some CAD simulations to work out what the structure needs to do."

COMPLAINT - 4

17. On or about December 2011, Yang tested another prototype utilizing the leaf spring system he had developed while employed by Vuly which yielded "impressive results". Yang then diverted his attention to designing and testing other structural elements of the Thunder Trampoline.

18. On or about April 26, 2012, Jonathan Lowe of D3 Design sent an email to Vuly's CEO attaching further illustrated proposals and explanatory notes regarding the Y design and the cross-over design (the Lowe email). Vuly's CEO forwarded an email from Lowe with an attachment to Yang. The attachment contained various "concept sketches." The email copied in Mr. Francis and states "[c]all David or myself and we can walk you through our thinking in more detail." The various "concept sketches" included the cross-over design in claimed in the '152 patent.

19. On or about April 28, 2012, Vuly's CEO sent an email to Yang asking Yang to "review this [attached] sketch, check this new concept out" and also notes "David has sent us many new design suggestions for the new pole concept to make the trampoline look different."

20. On or about April 30, 2012, Yang replied to the April 28, 2012 email, requesting Mr. Andon to "follow" the "attached sketch". The attached sketch was called the "low_frame.jpg". Yang's reply email did not query what the "new design suggestion" was, and the sketch attached to Yang's email ("low_frame.jpg") picked up the Y-shaped design for the safety poles in a number of the sketches in the Lowe Attachment.

21. On or about April 1, 2014, Yang's employment with Vuly ceased.

## THE RELATED PATENT APPLICATIONS

22. On July 30, 2014, Yang filed Chinese application CN201420425826 (the '826 application), naming himself as the applicant, which subsequently issued into Chinese Patent No. CN204073222 (the '222 patent).

23. On July 29, 2015, Yang filed a Patent Cooperation Treaty (PCT) application, PCT Application No. PCT/CN2015/085447 (the "PCT application"), claiming priority to the '826 application and naming himself as the applicant.

24. On November 26, 2014, Yang filed Australian Patent application AU20146268206 (the '206 application), naming himself as the applicant, and claims priority to the '826 application. The '206 application was examined but lapsed without gaining acceptance.

25. On May 1, 2015, Yang filed United States application 14/701,889 (the '889 application), naming himself as the applicant, and claims priority to the '826 application. The '889 application issued into the '152 patent, which is currently the subject of this litigation. A true and correct copy of the '152 patent is attached hereto as Exhibit A.

26. On February 22, 2017, Vuly filed Australian Patent application AU2017201197 (the '197 application), which names Vuly Property Pty Ltd as the applicant. The '197 application is a divisional application of the PCT application and claims priority to the '826 application.

27. On August 16, 2017, Yang filed Australian Patent application AU2017216515 (the '515 application), naming himself as the applicant, and claims priority to the '826 application. The '515 application is a divisional of the '206 application. Examination of the '515 application was requested on October 4, 2017, but this request was overtaken by the ownership dispute between Vuly and Yang before examination had commenced.

## THE YANG PATENT AND FOREIGN APPLICATIONS

28. The '826 application, the '515 application, the '206 application, and the '152 patent (collectively, the "Yang Patent and Foreign Applications")are directed to a frame structure for a trampoline, and in particular a trampoline that has a bounce mat surrounded by a safety net held in position by a number of safety pole assemblies.

29. The Yang Patent and Foreign Applications describe various embodiments of the invention with a series of drawings. A key feature common to all embodiments is the use of safety pole assemblies each comprising a pair of safety pole units that are "upwardly cross-joined" and follow a different path around the frame loop which supports the bounce mat. A number of optional features are described.

30. The '206 application includes only one independent claim. Claim 1 as filed was directed to a type of frame structure used for trampolines having the following features:

   a. A frame loop around a jump mat, consisting of multiple tubes connected end to end; and

   b. A plurality of safety pole assemblies assembled around the frame loop, comprising a first safety pole unit and a second safety pole unit upwardly cross-joined following different routes around the frame loop.

31. The scope of claim 1 of the '206 application remained unchanged upon lapsing of the 206 application.

32. The independent claims of the '515 application do not refer to the first and second safety pole units that are "cross-joined", but instead require the safety pole units to be joined at their upper ends after crossing each other at a location above the frame loop. This

difference in language aside, the independent claims of the '515 application essentially define the same features as the '206 application in addition to:

    a. a plurality of supporting assemblies to raise the frame loop and the jump mat above the ground, comprising a first support frame and a second support frame cross connected to the ground at a first end and the frame loop at a second end;

    b. a safety net connected to the upper end of each safety pole assembly and to the outer edge of the jump mat; and

    c. various mechanisms to join and connect the above features to form a trampoline structure.

33. As discussed above, the '515 application has not been examined by the Australian Patent Office.

34. The PCT application is in Chinese. The abstract refers to first and second "guardrail rods" that are connected "in a mutually crossed mode", and it is readily apparent from the drawings of the PCT application that these guardrail rods are equivalent to the cross-joined safety pole units of the '206 application and the '515 application.

35. The '152 patent claims the same features (difference in language usage aside) listed in the independent claims of the '515 application and '206 application, with similar descriptions and almost identical drawings.

**THE PROCEEDINGS BEFORE THE AUSTRALIAN PATENT COURT**

36. On December 11, 2016, Vuly requested a declaration under 36(1), in the Australian Patent Office, that Vuly alone is an eligible person on respect to the '206 application. This request was declined for procedural reasons.

37. On December 22, 2017, Vuly requested a second declaration under 36(1), in the Australian Patent Office, that Vuly alone is an eligible person on respect to the '206 and '515 applications. This request was again declined for procedural reasons.

38. On November 21, 2018 Vuly requested a third declaration under 36(1), in the Australian Patent Office, that Vuly alone is an eligible person on respect to the '206 and '515 applications. This request was granted.

39. On February 28, 2020, the Australian Patent Office, a court of competent jurisdiction, ruled that Vuly is the sole eligible person in respect to the '206 application and the '515 application. Attached Exhibit B is a true and correct copy of the Decision issued by the Australian Patent Office on February 28, 2020.

**YANG'S MISAPPROPRIATION OF VULY'S INTELLECTUAL PROPERTY**

40. Upon information and belief, Yang was an employee of Vuly at the time the invention was conceived.

41. Upon information and belief, Yang obtained the invention from those illustrations and filed the Yang Patent and Foreign Application naming himself as the applicant. Yang had an obligation to assign any inventions made by him during the course of his employment to Vuly. Thus, Vuly is entitled to the '152 patent for the invention described in the '152 patent pursuant to 28 U.S.C. § 2201.

**COUNT I**
**(Misappropriation of Intellectual Property)**

42. Vuly incorporates by reference the allegations of paragraphs 1-41 above.

43. Upon information and belief, Yang took the intellectual property belonging to Vuly and filed the '889 application, which issued into the '152 patent, without the authorization or authority of Vuly.

44. In filing such application, Yang made false and fraudulent claims that he was the owner of the inventive concepts of the '889 application.

45. Knowing such intellectual property was owned by Vuly, Yang received and now possesses the '152 patent without authorization.

46. Vuly has been directly and proximately injured as a result.

## COUNT II
### (Tortious Interference with Business Expectancy)

47. Vuly incorporates by reference the allegations of paragraphs 1-46 above.

48. By inventing valuable and useful technology, Vuly had a reasonable expectation of prospective business relationships arising from the sale of such technology.

49. Upon information and belief, Yang had knowledge of these expectations by Vuly.

50. By making false allegations to the Patent and Trademark Office, Yang intentionally interfered with this expectancy.

51. Such false allegations to the Patent and Trademark Officer were illegal. See, *e.g.*, 37 C.F.R. § 11.18.

52. Vuly has been harmed by these false representations in that Yang was awarded this patent by the U.S. Patent Office.

## COUNT III
### (Declaratory Judgment)

53. Vuly incorporates by reference the allegations of paragraphs 1-52 above.

54. The resolution of this Cause of Action necessarily depends on the resolution of a substantial question of patent law, including without limitation a determination of the rightful owner(s) of the '152 patent.

55. Pursuant to the employment agreement between Yang and Vuly, Vuly is the sole legal owner of the '152 patent.

56. As a result of the conduct and events described in detail above, Vuly possesses legal ownership, and/or equitable ownership and/or other interests in the '152 patent inconsistent with and superior to any interest claimed by Yang. Vuly's ownership and related interests include sole legal ownership of the '152 patent.

57. The Australian Patent Office, a court of competent jurisdiction, determined Vuly was the rightful owner of the '515 application and '206 application.

58. This Court should declare Vuly the sole legal owner of the '152 patent pursuant to 28 U.S.C. § 2201.

## PRAYER FOR RELIEF

A. An Order declaring Plaintiff possesses legal ownership or another interest in the '152 patent inconsistent with or superior to any interest asserted by Yang.

B. An award to Vuly of damages to compensate for Defendant's misappropriation and tortious interference with business expectancy in an amount to be proven at trial, including Vuly's actual damages and Yang's profits attributable to Yang's misappropriation;

C. An award of Vuly's attorneys' fees provided at least in 35 U.S.C. § 285;

D. Such other relief, in law or in equity, to which Vuly may be entitled, or which this Court may deem just and proper.

**[Signature Page Attached]**

August 24, 2020  By: _____/s/_____
Adam D. Mandell, Esq. (VA Bar # 68397)
Michael S. Culver, Esq. (VA Bar # 31386)
Millen White Zelano & Branigan, P.C.
2200 Clarendon Blvd., Suite 1400
Arlington, VA 22201
Telephone 703-243-6333
Facsimile  703-243-6410
E-mail: culver@mwzb.com, mandell@mwzb.com

Scott D. Swanson (*Pro Hac Vice to be submitted)*
Shaver & Swanson, LLP
913 W. River St. STE. 420
Boise, Idaho 83702
Tel: (208) 345-1122
Fax: (888) 388-6035

*Attorneys for VULY PTY LTD*